United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 24, 2003**

Charles R. Fulbruge III
Clerk

REVISED APRIL 9, 2003

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

**No. 01-31026**
_____

**TRAVIS PACE**

**Plaintiff - Appellant**

**versus**

**THE BOGALUSA CITY SCHOOL BOARD; LOUISIANA STATE BOARD OF
ELEMENTARY AND SECONDARY EDUCATION; THE LOUISIANA
DEPARTMENT OF EDUCATION; THE STATE OF LOUISIANA,**

**Defendants - Appellees.**

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

Before JONES, SMITH, and SILER,[*] Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellant Travis Pace appeals the district court's
dismissal of his claims brought under the Individuals with
Disabilities Education Act and the grant of the defendants' motions
for summary judgment on his claims brought under Title II of the

_____

[*]Circuit Judge of the 6TH Circuit, sitting by designation.

Americans with Disabilities Act and § 504 of the Rehabilitation Act. We affirm the district court's judgment for the Bogalusa City School Board. We also hold that the State of Louisiana, the Louisiana Department of Education, and the Louisiana State Board of Elementary and Secondary Education (collectively "State defendants") are entitled to sovereign immunity from Pace's claims under the Eleventh Amendment.

## I. BACKGROUND

In 1994, at the age of fifteen, Travis Pace (Pace) was enrolled at Bogalusa High School. He is developmentally delayed, confined to a wheelchair, and suffers from cerebral palsy and bladder incontinence. In July 1997, Pace's mother requested a due process hearing under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, et seq., as she believed that Pace was denied a "free appropriate public education" (FAPE) due to a lack of handicap accessible facilities at Bogalusa High School and deficiencies in Pace's "individualized education programs" (IEPs). The hearing officer found that the Bogalusa City Schools System[1] provided Pace with a FAPE in compliance with the IDEA, and the State Level Review Panel (SLRP) affirmed the hearing officer's decision.

---

[1]The hearing officer made findings with regard to the Bogalusa City Schools System. In federal court, Pace brought suit against the Bogalusa City School Board. For all practical purposes in this case the two entities are the same and will be referred to as "BCSB."

2

In September 1997, Pace filed a complaint with the Office for Civil Rights of the Department of Education (OCR), alleging violations of § 504 of the Rehabilitation Act (§ 504), 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132. The OCR and the BCSB resolved allegations that the BCSB operated services, programs, and activities that were physically inaccessible to or unusable by individuals with disabilities by entering into a voluntary written agreement under which the BCSB would identify accessibility barriers and the OCR would oversee the development of a compliance plan.

In March 1999, Pace filed suit in federal district court, seeking damages and injunctive relief against the BCSB, the Louisiana State Board of Elementary and Secondary Education, the Louisiana Department of Education, and the State of Louisiana, alleging violations of the IDEA, the ADA, § 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and various state statutes.[2] The district court bifurcated Pace's IDEA and non-IDEA claims. In separate orders, it affirmed the SLRP decision by dismissing Pace's IDEA claims, then granted the defendants' motions for summary judgment on Pace's non-IDEA claims. Pace appeals both decisions.

---

[2]We do not consider Pace's § 1983 claim and state law claims because he has not briefed them on appeal. L&A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106, 113 (5th Cir. 1994); F.R.A.P. 28(a)(9)(A).

## II. DISCUSSION

### A. State Sovereign Immunity

Before addressing the merits of Pace's claims, we must determine whether state sovereign immunity bars his claims against the State defendants. The Supreme Court has interpreted the Eleventh Amendment to prohibit suits against a state by its own citizens as well as by citizens of another state or foreign state.[3] See, e.g., Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 72-73, 120 S. Ct. 631, 640, 145 L. Ed. 2d 522, 535 (2000). There are only two exceptions to this longstanding rule. Coll. Sav. Bank v. Fla. Prepaid Post Secondary Educ. Expense Bd., 527 U.S. 666, 670, 119 S. Ct. 2219, 2223 (1999).[4] First, Congress may abrogate state sovereign immunity pursuant to § 5 of the Fourteenth Amendment, which grants Congress the power to enforce the substantive guarantees of the amendment through appropriate legislation. Id. Second, a state may waive its sovereign immunity by consenting to suit. Id. (citing Clark v. Barnard, 108 U.S. 436, 447-48, 2 S. Ct.

---

[3]The Eleventh Amendment provides:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.

[4]An individual seeking solely prospective relief may also sue a state official in his official capacity under Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). In this case, however, Pace has not named any state officials as defendants.

4

878, 883, 27 L. Ed. 780, 784-85 (1883)). At issue in this case is whether Pace's claims under the ADA, § 504 of the Rehabilitation Act, and the IDEA fall within either of these exceptions.

**1. Abrogation of state sovereign immunity through § 5 of the Fourteenth Amendment**

Pace's ADA claims against the State defendants are foreclosed by this court's recent decision in Reickenbacker v. Foster, 274 F.3d 974 (5th Cir. 2001). Reickenbacker held that Congress did not properly exercise its Fourteenth Amendment § 5 power to abrogate state sovereign immunity against claims brought under Title II of the ADA and § 504 of the Rehabilitation Act. To validly abrogate state sovereign immunity through § 5 of the Fourteenth Amendment, Congress must (1) unequivocally express its intent to abrogate state sovereign immunity, Kimel, 528 U.S. at 73, 120 S. Ct. at 640, 145 L. Ed. 2d at 535; (2) identify a pattern of unconstitutional action by the states, Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 368, 121 S. Ct. 955, 964, 148 L. Ed. 2d 866, 880 (2001); and (3) create rights and remedies that are congruent and proportional to the injury, City of Boerne v. Flores, 521 U.S. 507, 520, 117 S. Ct. 2157, 2164, 138 L. Ed. 2d 624, 638 (1997). In Reickenbacker, this court concluded that although Congress clearly expresses the intent to abrogate state sovereign immunity in both Acts,[5] it failed to identify a history and pattern

---

[5]42 U.S.C. § 12202 of the ADA provides:

A State shall not be immune under the eleventh amendment

5

of unconstitutional discrimination by the states against the disabled and imposed accommodation obligations on the states that exceed constitutional boundaries. Reickenbacker, 274 F.3d at 982-83.

Similarly, the IDEA does not validly abrogate the State defendants' state sovereign immunity. Like the ADA and § 504 of the Rehabilitation Act, the IDEA contains an express statement of intent to abrogate state sovereign immunity,[6] but in enacting the IDEA, Congress did not find that any disparate treatment of

---

to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 2000d-7(a)(1) provides:

A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794], title IX of the Education Amendments of 1972 [20 U.S.C.A. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C.A. § 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

[6] 20 U.S.C. § 1403(a) provides:

In general. A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter.

students with disabilities resulted from unconstitutional state action.[7] 20 U.S.C. § 1400(c). And even if Congress had identified constitutional transgressions by the states that it sought to remedy through the IDEA, the IDEA requirements, like the ADA and § 504 requirements, exceed constitutional boundaries. The IDEA, for example, requires the construction of new facilities and the alteration of existing facilities to comply with the same guidelines and standards used to determine ADA compliance, 20 U.S.C. § 1404(b), and this court has previously held that the ADA's accommodation obligation "far exceeds that imposed by the Constitution," Reickenbacker, 274 F.3d at 983. "In many instances, programs rationally related to a legitimate state interest--and thus constitutional under [City of] Cleburne [v. Cleburne Living Ctr., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)]–would be struck down as failing to satisfy the IDEA's requirement that students with disabilities receive a 'free appropriate public education.'" Bradley v. Ark. Dep't of Educ., 189 F.3d 745, 752 (8th

---

[7]Although the primary purpose of the IDEA is to make a FAPE available to all disabled children, 20 U.S.C. § 1400(d)(1)(A), Congress also desired to "ensure equal protection of the law" through the IDEA, id. § 1400(c)(6); Crawford v. Pittman, 708 F.2d 1028, 1036 (5th Cir. 1983) (The IDEA "involves both Congress' power to legislate under the spending clause and to assure equal protection of the laws to all alike under section five of the fourteenth amendment."). Congress's findings regarding the educational needs of children with disabilities and the lack of services within the public school system are set forth in 20 U.S.C. § 1400(c).

7

Cir. 1999), *vacated on other grounds sub nom.* by Jim C. v. United States, 235 F.3d 1079 (8th Cir. 2000) (en banc).

**2. Waiver of Eleventh Amendment sovereign immunity**

Although Congress did not validly exercise its Fourteenth Amendment § 5 power to abrogate states' sovereign immunity under the statutes at issue here, it may have validly conditioned the states' receipt of federal funds upon their waiving sovereign immunity against claims brought under § 504 of the Rehabilitation Act and the IDEA, statutes promulgated pursuant to the spending power.[8] "Incident to [the spending] power [set forth in Article I, Section 8 of the United States Constitution], Congress may attach conditions on the receipt of federal funds . . . ." South Dakota

---

[8]In Reickenbacker, this court specifically reserved the question whether states waive their sovereign immunity under § 504 of the Rehabilitation Act by accepting federal funds. Reickenbacker, 274 F.3d at 983. The conditional waiver argument does not apply to the ADA because the ADA is a purely prescriptive statute that does not in any way condition the receipt of federal funds on compliance with the Act or waiver of state sovereign immunity. Title II of the ADA applies to public entities, as defined in 42 U.S.C. § 12131, whether they receive federal funds or not. Although 42 U.S.C. § 2000d-7, enacted as part of the Rehabilitation Act Amendments of 1986, states, "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance," it does not condition the receipt of federal funds on a state's waiver of sovereign immunity under the ADA; the ADA contains its own abrogation provision in 42 U.S.C. § 12202, and according to a fundamental canon of statutory construction, the provision of a specific act controls over the general provision of another act absent clear legislative intent to the contrary. Ehm v. Nat'l R.R. Passenger Corp., 732 F.2d 1250, 1253 (5th 1984).

8

v. Dole, 483 U.S. 203, 206, 107 S. Ct. 2793, 2795-96, 97 L. Ed. 2d 171, 178 (1987). In dicta, the Supreme Court has stated that Congress may require states to waive their sovereign immunity as a condition for receiving federal funds. Coll. Sav. Bank, 527 U.S. at 686-87, 119 S. Ct. at 2231, 144 L. Ed. 2d at 623; Alden v. Maine, 527 U.S. 706, 755, 119 S. Ct. 2240, 2267, 144 L. Ed. 2d 636, 679 (1999). To do so, Congress must "manifest[] a clear intent to condition participation in the programs funded under the [relevant] Act on a State's consent to waive its constitutional immunity." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 247, 105 S. Ct. 3142, 3149-50, 87 L. Ed. 2d 171, 183 (1985).

In 1985, the Supreme Court held that § 504 of the Rehabilitation Act did not contain the unequivocal statutory language necessary to abrogate state sovereign immunity through § 5 of the Fourteenth Amendment and also held that the Act fell far short of manifesting the required clear intent to validly condition a state's receipt of federal funds on waiver of its sovereign immunity. Id. In response to Atascadero, Congress enacted 42 U.S.C. § 2000d-7, supra n.5. This court has held that in the context of Title IX, 42 U.S.C. § 2000d-7 clearly, unambiguously, and unequivocally conditions a state's receipt of federal educational funds on its waiver of sovereign immunity. Pederson v. La. State Univ., 213 F.3d 858, 876 (5th Cir. 2000). Today we extend

9

that portion of the Pederson holding to § 504 of the Rehabilitation Act as well.

We reject the state's argument that the Supreme Court's decision in Garrett implicitly overruled Pederson. Although § 2000d-7 and 42 U.S.C. § 12202 of the ADA contain nearly identical language, supra n.5, the Supreme Court's interpretation of 42 U.S.C. § 12202 in Garrett as an invalid abrogation clause does not necessarily mean that § 2000d-7 must also be viewed solely as an abrogation clause and not as a conditional waiver provision. Congress enacted § 504 of the Rehabilitation Act pursuant to its authority under the Spending Clause and clearly conditioned the receipt of federal funds on compliance with the Act's provisions. The ADA, on the other hand, is a purely prescriptive statute that does not in any way condition the receipt of federal funds on compliance with the ADA or waiver of state sovereign immunity. Thus, while § 2000d-7 and 42 U.S.C. § 12202 are identical for purposes of § 5 of the Fourteenth Amendment, § 2000d-7 may also be viewed as a conditional waiver provision enacted pursuant to Congress's spending power. Garcia v. S.U.N.Y. Health Scis. Ctr., 280 F.3d 98, 113 (2d Cir. 2001); Stanley v. Litscher, 213 F.3d 340, 344 (7th Cir. 2000). A number of other circuits have already so held.[9]

_____

[9]See, e.g., Koslow v. Pennsylvania, 302 F.3d 161, 170 (3d Cir. 2002); Robinson v. Kansas, 295 F.3d 1183, 1189-90 (10th Cir. 2002); Garcia, 280 F.3d at 113; Nihiser v. Ohio Envtl. Prot. Agency, 269 F.3d 626, 628 (6th Cir. 2001), *reh'g denied*, 2001 U.S. App. LEXIS

That § 2000d-7 authorizes a conditional waiver does not, however, equate with Louisiana's having waived its sovereign immunity by accepting federal funds under the Rehabilitation Act. As the Supreme Court has stated:

> There is a fundamental difference between a State's expressing unequivocally that it waives its immunity, and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that the State made an "altogether voluntary" decision to waive its immunity.

Coll. Sav. Bank, 527 U.S. at 680-81, 119 S. Ct. at 2228, 144 L. Ed. 2d at 619. An effective waiver of a state's sovereign immunity is the "intentional relinquishment or abandonment of a known right or privilege." Coll. Sav. Bank, 527 U.S. at 682, 119 S. Ct. at 2229, 144 L. Ed. 2d at 620 (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 (1938))(emphasis added). There is no suggestion in College Savings Bank that the preconditions for a state's waiver of sovereign immunity differ depending on the constitutional provision under which a federal statute was enacted, and indeed, any such distinction makes no sense.

---

26424, *cert. denied*, 122 S. Ct. 2588 (2002); Douglas v. Cal. Dep't of Youth Auth., 271 F.3d 812, 820-21 (9th Cir. 2001), *reh'g en banc denied*, 285 F.3d 1226 (2002); Jim C., 235 F.3d at 1080.

11

Prior to Reickenbacker,[10] the State defendants had little reason to doubt the validity of Congress's asserted abrogation of state sovereign immunity under § 504 of the Rehabilitation Act or Title II of the ADA.[11]  Believing that the acts validly abrogated their sovereign immunity, the State defendants did not and could not know that they retained any sovereign immunity to waive by accepting conditioned federal funds.  In Garcia, supra, the Second Circuit held that although § 2000d-7 expressed Congress's intent to condition acceptance of federal funds on a state's waiver of sovereign immunity, New York did not waive its sovereign immunity against § 504 claims by accepting federal funds from 1993 to 1995. The court reasoned that at the time New York accepted conditioned funds, Title II of the ADA was reasonably understood to abrogate sovereign immunity under Congress's Commerce Clause authority. Garcia, 280 F.3d at 114.  Likewise, though the Louisiana defendants accepted federal funds after Seminole Tribe v. Florida, 517 U.S.

---

[10]Although the Supreme Court's decision in Garrett, which preceded Reickenbacker, may have put states on notice that they retained sovereign immunity against claims brought under Title II of the ADA or § 504 of the Rehabilitation Act, the relevant time period during which the State defendants accepted federal funds in this case--1996 to 1998--occurred before Garrett was decided. In Garrett, the Supreme Court held that Title I of the ADA did not validly abrogate state sovereign immunity pursuant to § 5 of the Fourteenth Amendment because Congress did not identify a history and pattern of unconstitutional employment discrimination by the states against the disabled and because Title I's accommodation duty far exceeds what is constitutionally required.

[11] Because Title II of the ADA and § 504 of the Rehabilitation Act offer virtually identical protections, the abrogation analysis with regard to the two statutes is the same.  Reickenbacker, 274 F.3d at 977 n.17; see also Garcia, 280 F.3d at 114; Hoekstra v. Indep. Sch. Dist., 103 F.3d 624, 626 (8th Cir. 1996).

12

44, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996), and <u>City of Boerne</u> – where the Supreme Court explained and then delineated Congress's power to abrogate state sovereign immunity only through § 5 of the Fourteenth Amendment – they cannot be deemed to have anticipated, three to five years before the fact, the Court's decision in <u>Garrett</u> and this court's decision in <u>Reickenbacker</u>, especially given this court's decision in <u>Coolbaugh v. Louisiana</u>, 136 F.3d 430 (5th Cir. 1998) (holding that the ADA validly abrogated state sovereign immunity as an exercise of Fourteenth Amendment § 5 powers), *overruled by* <u>Reickenbacker</u>, 274 F.3d 974 (5th Cir. 2001). The Louisiana defendants' actions were voluntary, but they did not manifest a <u>knowing</u> waiver of that which they could not know they had the power to waive.

Similarly, although 20 U.S.C. § 1403 of the IDEA, <u>supra</u> n.6, constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of sovereign immunity,[12] <u>Bradley</u>, 189 F.3d at 753; <u>Bd. of Educ. v.</u>

---

[12]The title of 20 U.S.C. § 1403, "Abrogation of state sovereign immunity," does not limit the provision to being only an abrogation provision. "[H]eadings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. . . . [T]hey cannot undo or limit that which the text makes plain." <u>Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.</u>, 331 U.S. 519, 528-29, 67 S. Ct. 1387, 1392, 91 L. Ed. 1646, 1652 (1947). Despite the fact that the title of § 1403 uses the term "abrogation," the text and structure of the statute make clear that the voluntary acceptance of federal IDEA funds will result in the loss of state sovereign immunity. <u>Bradley</u>, 189 F.3d at 753 ("When it enacted §§ 1403 and 1415, Congress provided a clear, unambiguous warning of its intent to condition a state's participation in the IDEA program and its receipt of federal IDEA funds on the state's waiver of its immunity from suit in federal court on claims made under the IDEA.").

Furthermore, the fact that Congress enacted § 1403 in response to <u>Dellmuth v. Muth</u>, 491

<u>Kelly E.</u>, 207 F.3d 931, 935 (7th Cir. 1999), the State defendants in this case did not knowingly waive their immunity by accepting federal IDEA funds during the 1996-97 and 1997-98 school years. Prior to September 1998, no circuit court had held that § 1403 of the IDEA did not validly abrogate state sovereign immunity, and this circuit did not hold so until today.  Under the reasonable belief that the IDEA validly abrogated their sovereign immunity, the State defendants did not know that they retained any sovereign immunity to waive by accepting federal IDEA funds during the relevant time period.

The contrary conclusions of other circuits on the question of waiver under § 504 of the Rehabilitation Act[13] and the IDEA[14] tend to conflate the voluntariness and knowingness aspects of waiver.  The Second Circuit, however, correctly reasoned that

---

U.S. 223, 109 S. Ct. 2397, 105 L. Ed. 2d 181 (1989), which held that an earlier version of the IDEA did not evince an unmistakably clear intent to abrogate state sovereign immunity, does not limit § 1403 to being solely an abrogation provision and not a conditional waiver provision.  Rather, the legislative history indicates that Congress may have intended a waiver of state sovereign immunity, despite its employment of the term abrogation.  <u>See</u> H.R. Rep. No. 101-544, at 12 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1734. In the original House Report, a section entitled "Waiver of State Sovereign Immunity" indicates that <u>Dellmuth</u> misinterpreted Congressional intent and suggests that § 1403 was enacted because it would be "inequitable to deprive beneficiaries under the statute the opportunity to bring suit in federal court while requiring the state to conform to federal standards as a prerequisite for federal funds."  <u>Marie O. v. Edgar</u>, 131 F.3d 610, 618 n.15 (7th Cir. 1997).

[13]<u>See, e.g.</u>, <u>Koslow</u>, 302 F.3d at 170; <u>Robinson</u>, 295 F.3d at 1189-90; <u>Nihiser</u>, 269 F.3d at 628; <u>Douglas</u>, 271 F.3d at 820-21; <u>Jim C.</u>, 235 F.3d at 1080; <u>Stanley</u>, 213 F.3d at 344.

[14]<u>See, e.g.</u>, <u>Bradley</u>, 189 F.3d at 753; <u>Kelly E.</u>, 207 F.3d at 935.

14

> [t]hese cases are unpersuasive because they focus exclusively on whether Congress clearly expressed its intention to condition waiver on the receipt of funds and whether the state in fact received the funds. None of these cases considered whether the state, in accepting the funds, believed it was actually relinquishing its right to sovereign immunity so as to make the consent meaningful as the Supreme Court required in College Savings Bank, 527 U.S. at 682.

Garcia, 280 F.3d at 115 n.5; see also Douglas v. Cal. Dep't of Youth Auth., 285 F.3d 1226, 1228 (9th Cir. 2002) (O'Scannlain, J., dissenting from denial of reh'g en banc) ("Whether Congress clearly required that a State waive its immunity before accepting federal funds (the first inquiry) is not the same thing, however, as whether the State clearly declared its knowing waiver (the second inquiry)."). We therefore conclude that Pace's claims brought under Title II of the ADA, § 504 of the Rehabilitation Act, and the IDEA are barred against the State defendants in this case by state sovereign immunity.[15]

## B. Pace's IDEA claims

The district court decision regarding Pace's IDEA claims is a "mixed question of fact and law that is reviewed de novo, but the underlying fact-findings, 'such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error.'" Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 347 (5th Cir. 2000) (quoting Cypress-Fairbanks Indep. Sch.

---

[15]This decision represents a Pyrrhic victory, to the extent that after Garrett, the state defendants could knowingly waive their immunity because they could then reasonably have anticipated the ability to preserve sovereign immunity by declining federal funds under the Rehabilitation and IDEA statutes.

15

<u>Dist. v. Michael F.</u>, 118 F.3d 245, 252 (5th Cir. 1997)). We agree with the district court that Pace's IDEA claims were properly ruled on in the state administrative proceedings and that no procedural flaws infect them.

The IDEA requires states and local educational agencies that receive federal IDEA funds to make a FAPE available to all children with disabilities between the ages of three and twenty-one. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1). The appellees contend that Pace's IDEA claims are moot because he is now 23 years old and no longer attends Bogalusa High School. Although a plaintiff beyond the statutory age of entitlement has no right to seek injunctive relief requiring compliance with the IDEA, <u>Honig v. Doe</u>, 484 U.S. 305, 318, 108 S. Ct. 592, 601, 98 L. Ed. 2d 686, 703 (1988), he may seek compensation for violations of statutory rights that occurred while he was entitled to them. <u>Pihl v. Mass. Dep't of Educ.</u>, 9 F.3d 184, 189 (1st Cir. 1993); <u>Lester H. v. Gilhool</u>, 916 F.2d 865, 872 (3d Cir. 1990). Because compensatory education is an available remedy for individuals over the age of 21 who were denied a FAPE when they were covered by the IDEA, <u>Pihl</u>, 9 F.3d at 185; <u>Lester H.</u>, 916 F.2d at 873; <u>see</u> <u>also</u> <u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 63 (1st Cir. 2002) (compensatory education is an available remedy after graduation), we turn to the merits of Pace's IDEA claims.

The IDEA imposes extensive requirements on participating states and local agencies to safeguard the disabled child's right

16

to a FAPE. 20 U.S.C. §§ 1414, 1415. The primary safeguard is the IEP, Honig, 484 U.S. at 311, 108 S. Ct. at 597, 98 L. Ed. 2d at 699, a written statement prepared by a representative of the local school district, the disabled child's teachers and parents, and, whenever appropriate, the child, 20 U.S.C. § 1414(d). The IEP sets forth, inter alia, the child's present educational performance, annual and short-term goals, and educational and related services that will be provided for the child to meet the stated objectives, id., thereby tailoring the FAPE to the particular needs of the child, Cypress-Fairbanks Indep. Sch. Dist., 118 F.3d at 247.

The FAPE described in an IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." Id. at 247-48 (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 188-89, 102 S. Ct. 3034, 3042, 73 L. Ed. 2d 690, 701 (1982)). To determine whether a FAPE was available to Pace, the court must consider (1) whether the BCSB complied with the procedural requirements of the IDEA and (2) whether Pace's IEPs were reasonably calculated to enable him to receive educational benefits. Rowley, 458 U.S. at 206-07, 102 S. Ct. at 3051, 73 L. Ed. 2d at 712.

Regarding the first prong of the inquiry, adequate procedural compliance with IDEA requirements will assure, in most

17

cases, that the disabled child's right to a FAPE has been met. Buser v. Corpus Christi Indep. Sch. Dist., 51 F.3d 490, 493 (5th Cir. 1995). Failure to comply procedurally with the IDEA may alone warrant finding that the defendant failed to provide the plaintiff with a FAPE, id., but technical deviations will not render an IEP invalid, Burilovich v. Bd. of Educ., 208 F.3d 560, 566 (6th Cir. 2000). In this case, the BCSB adequately complied with the procedural requirements of the Act. Pace asserts that his 1996 and 1997 IEPs do not comply with IDEA requirements because they lack a statement of goals and evaluation procedures. This is wrong. Pace's 1996 and 1997 IEPs list numerous goals related to English, language arts, social studies, math, and his development of motor and vocational skills. Although an evaluation method is not listed for every single goal, the IEPs state that Pace's progress will be measured by teacher-made tests, teacher observation, report cards, student handouts, and Pace's work folder.

Pace next contends that the BCSB failed to comply with the procedural requirements of the IDEA because it did not provide him with transition services and did not invite other agencies to his transition plan meetings.[16] The record contradicts this claim.

---

[16]Under the IDEA, Pace's IEP must include a statement of transition services that focuses on his course of study and that includes, when appropriate, a statement of interagency responsibilities. 20 U.S.C. § 1414(d)(1)(A)(vii). The IDEA defines transition services as:

> [A] coordinated set of activities for a student with a disability that--

18

Pace's 1996 and 1997 IEPs include Individual Transition Plans detailing desired adult outcomes, school action steps, and family action steps for various areas of need such as postsecondary education, employment, living arrangements, homemaking, financial/income, advocacy/legal, community resources, recreation and leisure, transportation, and relationships. Further, Pace's IEP facilitator contacted the Office of Citizens with Developmental Disabilities and the Louisiana Rehabilitation Services Department to assist in providing Pace with transition services. The BCSB also complied with the IDEA's procedural requirements in other respects, allowing Pace's mother to provide meaningful input into decisions affecting his education and to raise objections. The BCSB participated in review of IDEA compliance at a due process hearing.

---

A) is designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

(B) is based upon the individual student's needs, taking into account the student's preferences and interests; and

(C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(30).

19

Regarding the second prong of the <u>Rowley</u> inquiry, this court "set forth four factors that serve as an indication of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA. These factors are whether (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." <u>Houston Indep. Sch. Dist.</u>, 200 F.3d at 347-48 (quoting <u>Cypress-Fairbanks</u>, 118 F.3d at 253).

Pace's IEPs easily satisfied these factors and were reasonably calculated to provide him with meaningful educational benefits. First, Pace's IEPs were individualized on the basis of his assessment and performance, reflecting both personal needs and goals. Pace contends that he was denied a FAPE because he was not provided with a computer tailored to assist his special needs, but his 1996 IEP states that he would use a computer to develop certain skills, and a computer was later placed in his classroom. Moreover, the hearing officer found that Pace chose to use a typewriter instead of a computer during the 1996-97 and 1997-98 school years.

Second, Pace was educated in the least restrictive environment.[17] He attended his normally assigned school and was mainstreamed with his peers as much as possible. In 1996, Pace received homebound services only because his wheelchair was broken and he could not attend school while it was being repaired. Testimony at the due process hearing indicates that Pace otherwise had no problems traversing the campus and attending his classes. Scheduled aides as well as an on-call aide were available to help Pace use the bathroom, and teachers helped him use the elevator and open doors. Furthermore, Pace's IEP facilitator testified at the due process hearing that Bogalusa High School constructed two new ramps, modified the elevator, and paved the old handicap parking area; it also added handicap signs, a curb extension to the school's front driveway, handicap parking in front of the school, and a handicap accessible water fountain to accommodate Pace.

Third, the key "stakeholders" provided services to Pace in a coordinated and collaborative manner. Pace's regular and special education teachers, social worker, physical therapist,

---

[17]20 U.S.C. § 1412(a)(5)(A) provides:

In general. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

21

occupational therapist, adaptive physical education teacher, principal, IEP facilitator, and attorney attended his 1997 IEP meeting. Representatives from the Office of Citizens with Developmental Disabilities and the Louisiana Rehabilitation Services Department were contacted and informed of Pace's needs.

Fourth, Pace received both positive academic and non-academic benefits from his educational program. Pace's 1997 reevaluation report states that he was meeting his IEP goals and had improved since the previous year. A comparison of his 1993 and 1996 California Achievement Test scores shows that he raised his grade point level in language expression, language mechanics, vocabulary, mathematics computation, mathematics concepts, and study skills; although he did not raise his grade level in social studies, science, comprehension, and spelling, "it is not necessary for [him] to improve in *every* area to obtain an educational benefit from his IEP." Houston Indep. Sch. Dist., 200 F.3d at 350. Physically and socially he improved in flexibility, mobility, and trunk strength as well as in his ability to form friendships with teachers and peers. Because the BCSB adequately complied with the procedural requirements of the IDEA and reasonably formulated Pace's IEPs to afford him educational benefits, we agree with the district court that Pace was not denied a FAPE.[18]

_____

[18]In his appeal brief, Pace also argues that the BCSB denied him a FAPE by failing to provide him with a personal aide. Because Pace did not raise this argument before the district court, he has waived it on appeal. Lifemark Hosps., Inc. v. Liljeberg Enters.,

## C. Pace's non-IDEA claims

The district court granted the defendants' motions for summary judgment on Pace's non-IDEA claims, concluding that they were precluded by the IDEA proceedings. The grant of summary judgment is reviewed de novo and may be affirmed on any ground raised below and supported by the record. McGruder v. Will, 204 F.3d 220, 222 (5th Cir. 2000). Summary judgment is proper if the record, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Hugh Symons Group v. Motorola, Inc., 292 F.3d 466, 468 (5th Cir. 2002).

Although an IDEA plaintiff can assert claims under other statutes, including the ADA and § 504 of the Rehabilitation Act, 20 U.S.C. § 1415(l);[19] Angela L. v. Pasadena Indep. Sch. Dist., 918

---

Inc., 304 F.3d 410, 427 n.29 (5th Cir. 2002). Nevertheless, the record shows that scheduled aides as well as an on-call aide were available to assist Pace.

[19]20 U.S.C. § 1415(l) provides:

Rule of construction. Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

F.2d 1188, 1193 n.3 (5th Cir. 1990), we agree with the Sixth, Eighth, and Tenth Circuits that when an administrative decision "is upheld on judicial review under IDEA, principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws." Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996); see also Burilovich v. Bd. of Educ., 208 F.3d 560 (6th Cir. 2000) (dismissing ADA, Rehabilitation Act, and state law claims because the plaintiff was offered a FAPE under the IDEA); Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 728 (10th Cir. 1996) (recognizing the similarity between the substantive and procedural frameworks of the IDEA and § 504 and concluding that if a disabled child is not entitled to a neighborhood placement under the IDEA, he is not entitled to such placement under § 504).

Pace and the United States as amicus curiae argue that the district court improperly precluded Pace's non-IDEA claims. Although the United States appears to concede that preclusion is proper when IDEA and non-IDEA claims are factually and legally indistinct from each other, it argues that Pace's IDEA and ADA claims are based on different legal theories because Pace's IDEA claims focus on whether he received meaningful educational benefits from his IEPs while his ADA claims address the accessibility of Bogalusa High School.[20] Pace and the United States seem to ignore

---

[20]After carefully comparing Pace's ADA and IDEA claims, we conclude that the only ADA claims that were not considered in

24

the fact that Pace's IDEA proceeding focused heavily on the accessibility of Bogalusa High School. In fact, when Pace's mother initially requested a due process hearing under the IDEA, she primarily expressed concern regarding the lack of handicap accessible facilities at Bogalusa High School and listed among her concerns the bathroom facilities and elevator as well as a lack of aides, ramps, handicap accessible doors, and first floor classes for the disabled. The hearing officer, the SLRP, the district court, and this court have all determined that Pace was not denied

Pace's IDEA proceedings are not properly in federal court. Pace and the United States argue that Pace's IDEA proceedings should not preclude his ADA claims because the district court did not consider whether the school's designation and installation of certain "accessible" facilities, such as the new ramps and handicap parking spaces, satisfy the standards set forth in the ADA and its implementing regulations for new construction and alteration to existing facilities. Although IDEA plaintiffs can bring claims under other statutes, such as the ADA, they must first exhaust administrative remedies with regard to their claim if they are seeking relief that is also available under the IDEA. 20 U.S.C. § 1415(l). In this case, Pace is seeking relief through his ADA claims that is available under the IDEA. The IDEA requires new construction and alteration of existing facilities to comply with the requirements of either the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (appendix A to 28 C.F.R. part 36) or the Uniform Federal Accessibility Standards (appendix A to 41 C.F.R. part 101-19.6), the same guidelines and standards used to determine compliance with Title II of the ADA. 20 U.S.C. § 1404(b); 28 C.F.R. § 35.151(c). Because Pace has not exhausted administrative remedies with regard to these claims, they are not properly before this court. Furthermore, Pace's ADA claim for injunctive relief is moot because he no longer attends Bogalusa High School, see Filardi v. Loyola Univ., No. 97 C 1814, 1998 U.S. Dist. LEXIS 3008, at *11-12 (N.D. Ill. Mar. 12, 1998), and his claim for damages fails because there is no evidence in the record that the defendants intentionally discriminated against him, Delano-Pyle v. Victoria County, 302 F.3d 567 (5th Cir. 2002). Rather, the BCSB bent over backward to furnish accommodations for Pace.

25

a FAPE because of accessibility concerns.  We therefore conclude that because Pace has been given thorough access to Bogalusa High School for purposes of complying with the IDEA's FAPE requirement, he has not been injured for purposes of asserting technical violations of the ADA regarding the architectural features of the facilities.

Pace also argues that his non-IDEA claims were improperly dismissed because his IDEA proceedings did not determine whether the BCSB discriminated against him in violation of the ADA and § 504 of the Rehabilitation Act.  To maintain a cause of action under the ADA or § 504 in this circuit, Pace must show that the BCSB "*refused* to provide reasonable accommodations for [him] to receive the full benefits of the school program."  <u>Marvin H. v. Austin Indep. Sch. Dist.</u>, 714 F.2d 1348, 1356 (5th Cir. 1983).[21] Because Pace, with the assistance and accommodations provided by the defendants, received meaningful benefits from a FAPE, we cannot conclude that the BCSB *refused* to provide reasonable accommodations to Pace in violation of the ADA and § 504.

---

[21]Although <u>Marvin H.</u> only stated the standard with regard to § 504, this circuit has held that because of similarities between Title II of the ADA and § 504, "[j]urisprudence interpreting either section is applicable to both."  <u>Hainze v. Richards</u>, 207 F.3d 795, 799 (5th Cir. 2000); <u>see also</u> <u>Hoekstra v. Indep. Sch.  Dist.</u>, 103 F.3d 624, 626 (8th Cir. 1996) (recognizing that the court has "consistently applied § 504 case law to ADA cases").

Rather, the BCSB provided Pace with reasonable accommodations that comply with both ADA and § 504 standards. ADA and § 504 regulations state that program accessibility compliance regarding existing facilities can be achieved through "the assignment of aides" or "any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section." 28 C.F.R. § 35.150(b)(1); 34 C.F.R. § 104.22(b).

The record shows that scheduled aides as well as an on-call aide were available to help Pace use the bathroom, and teachers helped Pace use the elevator and open doors. With this help, Pace did not have any problems getting around the school and attending his classes. Therefore, even if Pace's ADA and § 504 claims were not precluded by Pace's IDEA proceeding, summary judgment would still be proper because the defendants provided reasonable accommodations for Pace through the provision of aides and assistance that allowed him to receive the full benefits of his school program.

## III.  CONCLUSION

State sovereign immunity bars Pace's claims against the State defendants. We therefore vacate the district court's grant of the State defendants' motion for summary judgment and remand

27

with instructions to dismiss Pace's claims against the State defendants for lack of jurisdiction.  We affirm the district court's dismissal of Pace's IDEA claims against the BCSB as well as the grant of the BCSB's motion for summary judgment on Pace's non-IDEA claims.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED.**

28