

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-19-2003

# A.W. v. Jersey Cty Pub Sch

Precedential or Non-Precedential: Precedential

Docket No. 02-2056P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"A.W. v. Jersey Cty Pub Sch" (2003). *2003 Decisions.* Paper 286.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/286

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 19, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 02-2056

_____

A.W.

v.

THE JERSEY CITY PUBLIC SCHOOLS; NEW JERSEY
DEPARTMENT OF EDUCATION; JEFFREY V. OSOWSKI,
former Director, Division of Special Education; BARBARA
GANTWERK, Director, Office of Special Education
Programs; SYLVIA ELIAS, former Executive Director of
Pupil Personnel Services; PRISCILLA PETROSKY, Associate
Superintendent for Special Education; JOHN IWANOWSKI;
MARY HEPBURN; JOAN EDMISTON; DENISE BRAAK;
MARY MACEACHERN; EDWARD FAUERBACH, Learning
Disabilities Teacher-Consultants; NORMA CHRISOMALIS;
GWENDOLYN JACKSON; LINDA COLON; RONNE
BASSMAN; WILLIAM RONZITTI; ROXANNE JOHNSON,
Supervisors of Special Education; SHANETTE GREEN,
Teacher; MELINDA ZANGRILLO, Coordinator of
Compliance; JANE DOE AND JOHN DOE (1) - (5), all in
their official and individual capacities,

New Jersey Department of Education;
Jeffrey V. Osowski;
Barbara Gantwerk;
Melinda Zangrillo,

*Appellants*

United States of America,

*Intervenor*

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 01-cv-00140)
District Judge: Hon. William G. Bassler

———————

Argued April 1, 2003

BEFORE: MCKEE, SMITH and COWEN, *Circuit Judges*

(Filed: August 19, 2003)

———————

Todd J. Schwartz, Esq.
Michael Lombardi, Esq. (Argued)
Office of Attorney General
 of New Jersey
25 Market Street
P.O. Box 112
Trenton, NJ 08625

   Counsel for Appellants

Jeffrey E. Fogel, Esq.
661 Franklin Avenue
Nutley, NJ 07110

Elizabeth A. Athos, Esq. (Argued)
Education Law Center
60 Park Place
Suite 300
Newark, NJ 07102

   Counsel for Appellee A.W.

Stephen J. Edelstein, Esq.
Schwartz, Simon, Edelstein,
 Celso & Kessler
10 James Street
Florham Park, NJ 07932

> Counsel for Appellees Jersey City
> Public Schools; John Iwanoski;
> Mary Hepburn; Joan Edmiston;
> Denise Braak; Norma Chrisomalis;
> Linda Colon; Shanette Green;
> Gwendolyn Jackson

Raymond R. Connell, Esq.
Dwyer, Connell & Lisbona
100 Passaic Avenue
Fairfield, NJ 07004

> Counsel for Appellees Sylvia Elias;
> Priscilla Hernandez Petrosky; Mary
> Maceachern; Edward Fauerbach;
> William Ronzitti; Roxanne Johnson

Sarah E. Harrington, Esq. (Argued)
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

> Counsel for Intervenor-Appellee
> United States of America

---

**OPINION OF THE COURT**

---

COWEN, *Circuit Judge.*

Defendants the New Jersey Department of Education ("NJDOE"), Jeffrey Osowski, Barbara Gantwerk, and Melinda Zangrillo (collectively "State Defendants") appeal from the order of the United States District Court for the District of New Jersey denying their motion to dismiss. We must determine whether the State Defendants are entitled to constitutional immunity from plaintiff A.W.'s claims under section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794, and the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The District Court correctly held that the State Defendants have waived any immunity from these claims by the acceptance of the federal financial assistance. We therefore will affirm.

I.

In September 1988, A.W., who has dyslexia, enrolled as a second grade student in the Jersey City Public Schools. Until May 2000, he allegedly made only minimal progress in reading, writing, and spelling. According to A.W., the defendants knew or should have known of his medical condition. He was a nineteen year old high school student when he commenced this action.

A request was filed in December 1997 with the NJDOE on behalf of A.W. and other Jersey City students with dyslexia. The NJDOE is a recipient of financial assistance under the IDEA and other federal programs. The complainants sought an investigation of the alleged failure of the Jersey City Public Schools to diagnose dyslexia, provide specialized instruction to dyslexic students, and train its staff to handle dyslexia. They requested as relief independent evaluations of A.W. and other potentially dyslexic students as well as compensatory education. In a June 1998 report, the NJDOE found that the Jersey City Public Schools failed to demonstrate that its reading programs could be adapted "to meet the individual needs of classified pupils." App. at 86. It refused to consider whether the school district has failed to diagnose dyslexia and whether its personnel possessed sufficient expertise with this disability. The district was ordered to undertake corrective action regarding its reading curricula. The state agency allegedly did not provide any individual relief as to A.W. and "did not require the District to identify and implement knowledge derived from research and promising education practices in revising its reading curricula." *Id.* at 87.

Based on two new individual education programs, A.W. began to receive some instruction specially designed for dyslexia on February 29, 2000. A regular program of such

instruction commenced in May 2000, and he allegedly is making progress in reading, writing, and spelling.

A.W. filed a complaint with the District Court on January 10, 2001. In addition to the Jersey City Public Schools and numerous school district employees, the complaint named as defendants: (1) the NJDOE; (2) Gantwerk, the director of the NJDOE Office of Special Education Programs; (3) Osowski, the former director of the NJDOE Division of Special Education; and (4) Zangrillo, the former NJDOE compliance coordinator. The State Defendants moved to dismiss, and A.W. cross-moved to amend his complaint. In an order filed on March 18, 2002, the District Court denied the motion to dismiss and granted A.W. leave to file an amended complaint, which served as the basis for the District Court's subsequent opinion disposing of this motion to dismiss. This amended complaint contained ten counts and sought such relief as the entry of a judgment declaring that A.W.'s rights were violated and both compensatory and punitive damages.

A.W. asserted two causes of action under the IDEA against the NJDOE as well as Gantwerk, Osowski, and Zangrillo named in their official capacities. He alleged that they failed to ensure the identification and remediation of his dyslexia. The State Defendants also allegedly lacked sufficient knowledge and expertise with this condition, did not require the Jersey City Public Schools to employ appropriately trained staff, and failed to adopt the standards and procedures to evaluate the effectiveness of the district's programs. This conduct allegedly resulted in the deprivation of a free appropriate public education. He also claimed that the NJDOE's denial of a free appropriate public education violated section 504. Gantwerk and Zangrillo, named in their individual capacities, were allegedly liable pursuant to 42 U.S.C. § 1983 for infringing his rights under the IDEA and section 504 by conducting an allegedly ineffective complaint investigation. A.W. finally asserted claims pursuant to the New Jersey Constitution and the New Jersey Law Against Discrimination.

Following a reference of this matter to mediation, the District Court issued a written opinion on May 1, 2002. The District Court considered inter alia the State Defendants'

claim of Eleventh Amendment immunity. It declined to resolve the question of whether Congress properly exercised its power of abrogation under Section 5 of the Fourteenth Amendment. The District Court, however, found that New Jersey waived its immunity as to A.W.'s section 504 and IDEA claims by accepting federal funds when Congress clearly conditioned the receipt of any such assistance on the state's abandonment of immunity. The State Defendants appealed. The United States subsequently intervened in this appeal, arguing for affirmance.

## II.

The District Court's denial of the State Defendants' motion to dismiss does not constitute an otherwise appealable final decision pursuant to 28 U.S.C. § 1291. The District Court's rejection of Eleventh Amendment immunity is immediately appealable under the collateral order doctrine. *See, e.g., P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993); *Pa. Fed'n of Sportmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 315 (3d Cir. 2002). We must decide whether the District Court correctly rejected the State Defendants' claim of constitutional immunity from A.W.'s Rehabilitation Act and IDEA causes of action.[1] We exercise plenary review. *See, e.g., Koslow v. Pennsylvania*, 302 F.3d 161, 167 (3d Cir. 2002), *cert.* denied, 123 S. Ct. 1353 (2003).

We rule that Congress unequivocally expressed its intent to condition participation in these two federal assistance programs on the state's relinquishment of its immunity and that New Jersey, by accepting these funds, surrendered its constitutional right to immunity as to A.W.'s claims against the State Defendants. This waiver condition is also valid under the Spending Clause to the United States

---

1. Responding to the State Defendants' argument regarding immunity from section 1983 causes of action against state agencies and state employees named in their official capacities, A.W. clarifies that his amended complaint contained no such claims. He also withdraws his state law claims against the NJDOE.

Because of the limited scope of our jurisdiction, we do not address any issue other than Eleventh Amendment immunity at this time.

Constitution. The District Court therefore correctly rejected any claim of constitutional immunity.

### III.

The general principles governing the application of the Eleventh Amendment and Congress's right to attach conditions to federal funding under the Spending Clause are well established. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. A state is generally entitled to immunity in federal court from suits by private parties, including their own citizens. *See, e.g., Koslow v. Pennsylvania*, 302 F.3d 161, 167 (3d Cir. 2002), *cert. denied*, 123 S. Ct. 1353 (2003); *MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 503 (3d Cir 2001), *cert. denied*, 123 S. Ct. 340 (2002). This protection from suit extends to state agencies as well as state officials sued in their official capacities for monetary damages. *See, e.g., Broselow v. Fisher*, 319 F.3d 605, 607 (3d Cir. 2003); *MCI Telecomm. Corp.*, 271 F.3d at 503.

The parties raise two exceptions to this rule of constitutional immunity. Congress is permitted to abrogate the states' Eleventh Amendment immunity pursuant to its enforcement power under Section 5 of the Fourteenth Amendment. *See, e.g., Koslow*, 302 F.3d at 168. Although it is asserted that Congress validly abrogated state immunity from Rehabilitation Act and IDEA claims, we, like the District Court, need not reach this issue because a state may waive "its sovereign immunity by consenting to suit." *College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) (citing *Clark v. Barnard*, 108 U.S. 436, 447-48 (1883)); *see also, e.g., Koslow*, 302 F.3d at 168.

We must apply a stringent test to determine whether a state has actually waived its Eleventh Amendment

immunity from federal-court jurisdiction. *College Sav. Bank*, 527 U.S. at 675 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985)); *see also, e.g., MCI Telecomm. Corp.*, 271 F.3d at 503. Because a state's right to immunity is guaranteed by the Constitution, there must be an " 'intentional relinquishment or abandonment of a known right or privilege.' " *MCI Telecomm. Corp.*, 271 F.3d at 504 (quoting *College Sav. Bank*, 527 U.S. at 681-82). A state is deemed to waive its immunity only where such waiver is " 'stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." ' " *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1999) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)); *see also, e.g., Koslow*, 302 F.3d at 172. A court must " 'indulge every reasonable presumption against waiver.' " *College Sav. Bank*, 527 U.S. at 682 (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)).

Under certain circumstances, a state may surrender its immunity by accepting federal funds conditioned on the state's waiver of immunity. This exception relies on an understanding of both the Eleventh Amendment itself as well as Congress's power under the Spending Clause to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. In the recent decision of *Koslow v. Pennsylvania*, 302 F.3d 161 (3d Cir. 2002), *cert. denied*, 123 S. Ct. 1353 (2003), we recognized that " 'Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds even though Congress could not order the waiver directly.' " *Id.* at 172 (quoting *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000) (en banc)).

This understanding of waiver is based on the notion of gratuity or gift. The Supreme Court considered a theory of "constructive waiver" of immunity in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999). The plaintiff brought a Lanham Act claim against an agency of the Florida state government, arguing, inter alia, that any sovereign immunity was waived when the agency voluntarily engaged in the federally

regulated activity of running a for-profit college tuition prepayment program following the enactment of the Trademark Remedy Reduction Act. *Id.* at 670-72, 676. The Supreme Court rejected this argument that a state's conduct of otherwise lawful activity gives rise to a waiver and overruled the "constructive waiver" doctrine announced in *Parden v. Terminal Ry.*, 377 U.S. 184 (1964). *College Sav. Bank*, 527 U.S. at 675-87; *see also, e.g., MCI Telecomm. Corp.*, 271 F.3d at 504 ("Congress no longer may statutorily coerce a state into relinquishing its sovereign immunity on threat of the state being excluded from participating in an otherwise lawful and permissible activity." (citations omitted)).

The Supreme Court, however, expressly distinguished Congress's bestowal of the gift of federal financial assistance from this rejected doctrine. *College Sav. Bank*, 527 U.S. at 678 n.2, 686-87. A waiver of immunity in exchange for a congressional gratuity or benefit to which a state is not otherwise entitled is ordinarily different from a "waiver" arising out of the threatened prohibition of permissible conduct. *Id.; see also, e.g., MCI Telecomm. Corp.*, 271 F.3d at 505. Congress therefore may "require a state to waive immunity in order to engage in an activity in which the state may not engage absent congressional approval, or in order to receive a benefit to which the state is not entitled absent a grant or gift." *MCI Telecomm. Corp.*, 271 F.3d at 505.

Congress must expressly indicate that this waiver constitutes a condition of its gratuity. It is necessary for Congress to "manifest[ ] a clear intent to condition participation in the programs funded under the [statute] on a State's consent to waive its constitutional immunity." *Atascadero State Hosp.*, 473 U.S. at 247; *see also, e.g., Koslow*, 302 F.3d at 170. This requirement for Congress to "speak with a 'clear voice' ensures that the states exercise their choice knowingly and voluntarily, cognizant of the consequence (waiver of constitutional immunity)." *MCI Telecomm. Corp.*, 271 F.3d at 506 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

The State Defendants assert that no waiver occurs absent an express statement of waiver by the state. They

apparently argue that a state retains its constitutional immunity unless its legislature formally enacts a waiver provision. It is true that a state does not waive its immunity merely by accepting federal funds. *See, e.g., Atascadero State Hosp.*, 473 U.S. at 246-47; *Koslow*, 302 F.3d at 172 (citing *Edelman*, 415 U.S. at 673). A state also must generally make "a 'clear declaration' that it intends to subject itself to our jurisdiction." *College Sav. Bank*, 527 U.S. at 676 (citing *Great No. Life Ins. Co. v. Read*, 322 U.S. 47, 54 (1944)); *see also, e.g., MCI Telecomm. Corp.*, 271 F.3d at 504.

But a state's acceptance of federal financial aid in the face of a clearly expressed condition by Congress may give rise to a waiver of sovereign immunity even in the absence of any express statement of waiver by the state or its legislature. It is well established that "[a] State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program." *Atascadero State Hosp.*, 473 U.S. at 238 n.1. The state's "acceptance of the funds entails an agreement" to the condition of consenting to suit in federal court. *College Sav. Bank*, 527 U.S. at 686. We have observed that "where a state participates in a federal financial assistance program 'in light of the existing state of the law,' the state is charged with awareness that accepting federal funds can result in the waiver of Eleventh Amendment immunity." *Koslow*, 302 F.3d at 172 (quoting *Edelman*, 415 U.S. at 687 (Douglas, J., dissenting)).[2]

This Court therefore has continued to recognize the validity of "conditional types of constitutional waiver" based on the state's receipt of either conditioned federal funds or another federal gift. *MCI Telecomm. Corp.*, 271 F.3d at 504. In *Koslow*, we concluded that Pennsylvania surrendered its constitutional immunity from section 504 claims against

---

2. Contrary to the State Defendants' suggestion, it is not relevant to our discussion that the *Koslow* court actually quoted the dissenting opinion by Justice Douglas in *Edelman v. Jordan*, 415 U.S. 651 (1974). We are still bound to follow *Koslow*'s understanding of waiver, which in any event is consistent with the overall case law.

the Department of Corrections because of the acceptance of federal funds for this agency. *Koslow*, 302 F.3d at 167-72. The Court in *MCI Telecommunication Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491 (3d Cir. 2001), *cert. denied*, 123 S. Ct. 340 (2002), ruled that the Pennsylvania Public Utility Commission and its commissioners waived their Eleventh Amendment immunity as to claims under the 1996 Telecommunications Act "by voluntarily accepting the congressional gift or gratuity of the power to regulate local telecommunications competition under the Act." *Id.* at 513. In neither case did the Court consider whether the Pennsylvania General Assembly adopted legislation specifically waiving this immunity or whether any other express statement of such waiver was given. In the context of the gift of federal funds, the clear congressional statement that entitlement to federal funds is conditioned on the waiver of immunity, taken together with the state's receipt of these funds, constitute a declaration of the state's submission to federal-court jurisdiction. *See id.* at 524-25 (Ambro, J., concurring in part and dissenting in part) ("Congress's clarity of expression and the resulting action by the state substitute for the state's own expression of waiver.")

Congress also may not exceed its admittedly expansive power under the Spending Clause when it establishes waiver as a condition of funding. In *Koslow*, we summarized these requirements, taken from the Supreme Court's ruling in *South Dakota v. Dole*, 483 U.S. 203 (1987). *Koslow*, 302 F.3d at 172 n.11, 175. First, the use of the spending power "must be in pursuit of 'the general welfare'." *Dole*, 483 U.S. at 207 (citations omitted). Congress must also state any condition of funding unambiguously, thereby " 'enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.' " *Id.* (quoting *Pennhurst State Sch. & Hosp.* 451 U.S. at 17). Furthermore, conditions on federal grants of financial assistance "might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.' " *Id.* (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)). Other constitutional provisions may also further prevent any scheme of conditional funding. *Id.* at 208. Finally, the financial pressure placed on the state by the conditional

grant of federal funds may rise to the level of unconstitutional coercion or compulsion. *Id.* at 211 (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)); *see also, e.g., Koslow*, 302 F.3d at 172 n.11, 173-74.

In considering a Spending Clause challenge to the waiver of immunity under the Rehabilitation Act, we rejected the argument that the waiver condition must be specifically tailored to a particular federal interest. *Koslow*, 302 F.3d at 175 (quoting *Dole*, 483 U.S. at 208 n.3). We stated that "one need only identify a discernible relationship imposed by a Rehabilitation Act condition on a 'department or agency' and a federal interest in a program it funds." *Id.* The State Defendants argue that this understanding of the relatedness prong is incorrect because more than a mere discernible relationship is necessary, especially in the context of the constitutional right to state sovereign immunity. They assert that *Dole* actually required Congress to make specific findings of relatedness in the text of the statute itself. The *Dole* Court, in rejecting a challenge to a federal law providing for the withholding of certain federal highway funds if the state's drinking age is below twenty-one, never ruled that Congress must provide such findings. *Dole*, 483 U.S. at 205, 208-09. In any case, we remain bound by our adoption of the "discernible relationship" standard. *See* 3d Cir. I.O.P. 9.1 ("It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels.").

A. Rehabilitation Act

Section 504 of the Rehabilitation Act provides in relevant part that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a). In *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), the Supreme Court decided that the Rehabilitation Act "falls far short of manifesting a clear

intent to condition participation in the programs funded under the [Rehabilitation] Act on a State's consent to waive its constitutional immunity." *Id.* at 247. Congress responded with the Civil Rights Remedies Equalization Act, adopted as part of the Rehabilitation Act Amendments of 1986. 42 U.S.C. § 2000d-7 provides in full:

§ 2000d-7. Civil rights remedies equalization

(a)  General provision

**(1)**  A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

**(2)**  In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

(b)  Effective date

The provisions of subsection (a) of this section shall take effect with respect to violations that occur in whole or in part after October 21, 1986.

The District Court found that this provision is an unambiguous expression of Congress's intent to condition the receipt of "Federal financial assistance" on the state's consent to waive its constitutional immunity. We subsequently reached the same conclusion in *Koslow*.

In *Koslow*, a fired prison employee afflicted by a back condition brought, among other causes of action, a Rehabilitation Act claim against Pennsylvania doing business as the Department of Corrections as well as the prison superintendent. *Koslow*, 302 F.3d at 165. Pennsylvania receives federal funds for numerous purposes,

and several federal grants, including funds under the State Criminal Alien Assistance Program ("SCAAP"), were provided to its Department of Corrections. *Id.* at 166-67. SCAAP was established to alleviate the states' costs for incarcerating illegal aliens convicted of state crimes, but such funds were not tracked and need not be used for this specific purpose. *Id.* at 167.

Especially relying on the Supreme Court's characterization of section 2000d-7 as "an unambiguous waiver of the States' Eleventh Amendment immunity," *Lane v. Pena*, 518 U.S. 187, 200 (1996), we joined other circuit courts[3] in holding that the statutory provision clearly notified the states "that by accepting federal funds under the Rehabilitation Act, they would waive their Eleventh Amendment immunity to Rehabilitation Act claims," Koslow, 302 F.3d at 170 (citing *United States Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986)).

We, however, also recognized the limited scope of any such waiver based on the Rehabilitation Act's prohibition of disability discrimination "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Given the act's definition of "program or activity,"[4] the

3. Circuit courts have consistently seen section 2000d-7 as an unambiguous statement of Congress's intent to condition acceptance of federal funds on the waiver of Eleventh Amendment immunity from claims under such enumerated statutes as the Rehabilitation Act or Title IX. *See, e.g., Robinson v. Kansas*, 295 F.3d 1183, 1190 (10th Cir. 2002), *pet. for cert. filed*, 71 U.S.L.W. (U.S. Jan. 22, 2003) (No. 02-1314); *Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98, 113 (2d Cir. 2001); *Nihiser v. Ohio Envtl. Protection Agency*, 269 F.3d 626, 628 (6th Cir. 2001), *cert. denied*, 536 U.S. 922 (2002); *Jim C. v. United States*, 235 F.3d 1079, 1082 (8th Cir. 2000) (en banc), *cert. denied*, 533 U.S. 949 (2001); *Pederson v. La. State Univ.*, 213 F.3d 858, 875-76 (5th Cir. 2000); *Cherry v. Univ. of Wis. Sys. Bd.*, 265 F.3d 541, 554-55 (7th Cir. 2001); *Sandoval v. Hagan*, 197 F.3d 484, 493-94 (11th Cir. 1999), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001); *Litman v. George Mason Univ.*, 186 F.3d 544, 553-54 (4th Cir. 1999); *Clark v. California*, 123 F.3d 1267, 1271 (9th Cir. 1997).

4. Section 504 defines a "program or activity" as encompassing:

*Koslow* court found that any waiver is limited to the department actually receiving federal financial assistance but includes all of the operations of that department regardless of whether the particular activities are federally assisted. *Koslow*, 302 F.3d at 168, 171-72, 176.

We held that Pennsylvania's knowing acceptance of SCAAP funds for its Department of Corrections resulted in the waiver of immunity as to section 504 claims against this department. *Id.* at 172 & n.12. We also considered challenges to this waiver under the Spending Clause and the "unconstitutional conditions" doctrine. *Id.* at 173-76. This Court found a discernible connection between the waiver of immunity and Congress's interest, which "flows with every dollar spent by a department or agency receiving federal funds," in eliminating disability discrimination in federally supported departments or agencies. *Id.* at 175-76. We further noted that the limitation of any waiver to the department or agency actually receiving the funds "helps ensure the waiver" satisfies this relatedness requirement. *Id.* at 176. In rejecting a claim of coercion and unconstitutional conditions, *see id.* at 172 n.11 (noting that coercion arguments are considered in discussion of unconstitutional conditions), we observed that a state possesses political powers, particularly the power to tax, that "help ensure the federal government does not 'coerce' the state through economic 'encouragement,' " *id.* at 174. Even though the refusal of all federal financial assistance for the Department of Corrections would have fiscal and possibly political ramifications for state officials, we recognized that Pennsylvania remained free to make this choice. *Id.*

---

. . . all of the operations of—

**(1)(A)** a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

**(B)** the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government[.]

29 U.S.C. § 794(b).

We are bound by our decision in *Koslow*. Given the clarity of section 2000d-7, New Jersey has waived its immunity as to the section 504 claim against the NJDOE by accepting federal financial assistance for this department. The State Defendants argue, relying on the view first developed by the Second Circuit in *Garcia v. S.U.N.Y. Health Sciences Center*, 280 F.3d 98 (2d Cir. 2001), that the state could not have knowingly relinquished its immunity from section 504 claims because it believed Congress already abrogated this immunity under the essentially identical terms of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* The Court in *Koslow* expressly rejected this argument with regard to the Rehabilitation Act. *Koslow*, 302 F.3d at 172 n.12. We distinguished between section 504 and the ADA by noting that "the ADA was not enacted to alter existing causes of action" and therefore concluded that Pennsylvania knowingly waived its immunity from Rehabilitation Act claims by accepting funds under the statute. *Id.* (citing 42 U.S.C. § 12201(b)). Given this precedent, we may not apply the *Garcia* approach to A.W.'s Rehabilitation Act claim and must likewise reject the State Defendants' assertion of undue compulsion in light of *Koslow*. We therefore conclude that neither the Eleventh Amendment nor the Spending Clause bar A.W.'s claim under section 504 of the Rehabilitation Act.

## B. IDEA

In *Dellmuth v. Muth*, 491 U.S. 223 (1989), the Supreme Court held that the IDEA[5] did not "evince an unmistakably clear intention to abrogate the States' constitutionally secured immunity from suit." *Id.* at 232. Congress responded with a provision of the Education of the Handicapped Act Amendments of 1990. Section 604 of the IDEA, codified as 20 U.S.C. § 1403, states in full:

§ 1403. Abrogation of state sovereign immunity

---

5. The statutory scheme currently known as the IDEA was previously entitled the Education of the Handicapped Act and the Education for All Handicapped Children Act. For purposes of clarity and consistency, we refer to the statute as the IDEA.

(a) In general

A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter.

(b) Remedies

In a suit against a State for a violation of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as those remedies are available for such a violation in the suit against any public entity other than a State.

(c) Effective date

Subsections (a) and (b) of this section apply with respect to violations that occur in whole or part after October 30, 1990.

New Jersey has adopted a thorough statutory and administrative regime pursuant to the IDEA, and its education department has been the recipient of federal financial aid pursuant to this statute. *See* N.J. Stat. Ann. § 18A:46-1 *et seq.*; N.J. Admin. Code ch. 14. The District Court found that section 1403 is a clear statement of waiver and concluded that the State Defendants' acceptance of IDEA funds gave rise to a waiver of immunity. Although the IDEA presents a closer question than the Rehabilitation Act and section 2000d-7, we agree that the State Defendants are no longer immune from suit under the IDEA.

We have not previously addressed the question of whether this provision constitutes a clear expression of legislative intent to condition receipt of federal IDEA funds on a state's waiver of sovereign immunity. We did briefly discuss this provision in *Beth V. ex rel. Yvonne V. v. Carroll*, 87 F.3d 80 (3d Cir. 1996). We held that a plaintiff enjoys an express right of action under the IDEA for a state's failure to comply with the complaint resolution process established in federal education regulations. *Id.* at 85-88. We noted the consistency of this holding with Congress's understanding of the "integral" role of private suits in the enforcement of the IDEA:

> Congress' reliance on a private action as one of the principal enforcement mechanisms of the rights guaranteed under IDEA is demonstrated by its prompt enactment of a 1989 amendment to IDEA which makes express its abrogation of the states' Eleventh Amendment immunity from suit. *See* 20 U.S.C. § 1403 (overturning the decision in *Dellmuth v. Muth*, 491 U.S. 223, 109 S. Ct. 2397, 105 L. Ed. 2d 181 (1989)).

*Id.* at 88. The State Defendants assert that the decisions in *Dellmuth* and *Beth V.* establish that section 1403 constitutes a clear attempt by Congress to abrogate state sovereign immunity and not an unambiguous expression of intent to make the waiver of this immunity a condition of federal funding.

Our statement in *Beth V.* purporting to recognize section 1403 as an abrogation provision was mere dicta because we were concerned with the existence of a private right of action and not whether state defendants are entitled to the protections of the Eleventh Amendment. It appears uncontested by the parties that section 1403 constitutes an unambiguous statement of intent to abrogate Eleventh Amendment immunity. *See, e.g., Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609, 614 (5th Cir. 2003); *Little Rock Sch. Dist. v. Mauney*, 183 F.3d 816, 822 (8th Cir. 1999), *abrogation recognized by Bradley v. Ark. Dep't of Educ.*, 189 F.3d 745 (8th Cir. 1999), *rev'd on other grounds sub nom. Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000) (en banc), *cert. denied*, 533 U.S. 949 (2001). Section 1403, however, is logically capable of constituting both a clear statement of abrogation and an unambiguous expression of an intent to condition the availability of federal IDEA funds on the state's relinquishment of immunity.[6] Several circuit

---

6. The confusion as to the use of terms such as abrogation and waiver also weigh against any unwarranted reliance on this dicta. Courts have occasionally used these terms interchangeably. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 672 (1974) ("The question of waiver or consent under the Eleventh Amendment was found in those cases to turn on whether Congress had intended to abrogate the immunity in question, and whether the State by its participation in the program authorized by Congress had in effect consented to the abrogation of that immunity."). Although such practices do not detract from the obligation of statutory clarity, they do indicate that we should not give too much weight to our very brief reference in *Beth V.*

courts have actually recognized that section 1403 is both an abrogation and a waiver provision. *See, e.g., Pace*, 325 F.3d at 614, 617; *Mauney*, 183 F.3d at 822, 831-32.

Every circuit court to have addressed the issue has held that the section unambiguously expresses Congress's intent to condition entitlement to federal financial assistance under the IDEA on a state's surrender of immunity. After suggesting the essential correctness of this approach, *Marie O. v. Edgar*, 131 F.3d 610, 617-18 (7th Cir. 1997), the Seventh Circuit specifically adopted this view in *Board of Education v. Kelly E.*, 207 F.3d 931, 935 (7th Cir. 2000). *See also Zambrano v. Reinert*, 291 F.3d 964, 973 (7th Cir. 2002) (Easterbrook, J., concurring) (stating that "[IDEA], another federal program that attaches conditions to grants, has a clause, 20 U.S.C. § 1403(a), requiring states that take money to consent to suits by private persons.")). The Eighth Circuit considered a state's immunity from IDEA claims in *Little Rock School District v. Mauney*, 183 F.3d 816 (8th Cir. 1999). It held that the IDEA successfully eliminated this immunity under the Fourteenth Amendment and, alternatively, that section 1403 clearly conditions receipt of IDEA funding on a state's consent to waive its immunity. *Id.* at 822-32. The Eighth Circuit later concluded that this abrogation holding was no longer good law due to intervening precedent. *Bradley v. Ark. Dep't of Educ.*, 189 F.3d 745, 750-52 (8th Cir. 1999), *rev'd on other grounds sub nom. Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000) (en banc), *cert. denied*, 533 U.S. 949 (2001). But the court, reaffirming *Mauney*'s waiver ruling, held that Congress "provided a clear, unambiguous warning of its intent to condition a state's participation in the IDEA program and its receipt of federal IDEA funds on the state's waiver of its immunity" by enacting both section 1403 as well as section 1415 authorizing challenges to IDEA determinations in federal court. *Id.* at 753. In *Pace v. Bogalusa City School Board*, 325 F.3d 609 (5th Cir. 2003), the Fifth Circuit recently agreed that this statutory provision "constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of sovereign immunity."[7] *Id.* at 617 (citing *Bradley*, 189 F.3d at 753; *Kelly E.*, 207 F.3d at 935).

---

7. The Second Circuit characterized section 1403 in dicta as a "waiver of sovereign immunity" for claims brought pursuant to the IDEA. *Bd. of*

No circuit or district court has specifically found that section 1403 fails to notify the states with the necessary clarity that acceptance of federal IDEA funds is dependent on the waiver of their constitutional right to immunity. This case law is generally based on an examination of the language of section 1403 itself. In considering the terms of this provision, we are also guided by our ruling in *Koslow* that section 2000d-7 clearly states that waiver of immunity from Rehabilitation Act causes of action is a condition of federal financial assistance. *Koslow*, 302 F.3d at 168-72. We therefore turn to the language of these two statutory provisions.

The operative language of section 2000d-7 covering the Rehabilitation Act provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." The terms of section 1403 appear very similar: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter." Section 2000d-7 therefore has been considered a "parallel provision" to section 1403. *Mauney*, 183 F.3d at 831. Several courts have actually relied on case law considering the IDEA section as support for the conclusion that section 2000d-7 likewise constitutes a clear waiver provision. *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000); *Sandoval v. Hagan*, 197 F.3d 484, 493-94 (11th Cir. 1999), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001); *Neiberger v. Hawkins*, 208 F.R.D. 301, 312 (D. Colo. 2002); *White v. Engler*, 188 F. Supp. 2d 730, 741 (E.D. Mich. 2001); *Robinson v. Kansas*, 117 F. Supp. 2d 1124, 1132 (D. Kansas 2000), *aff'd*, 295 F.3d 1183 (10th Cir. 2002), *pet. for cert. filed*, 71 U.S.L.W. (U.S. Jan. 22, 2003) (No. 02-1314).

---

*Educ. v. Schutz*, 290 F.3d 476, 480 (2d Cir. 2002), *cert. denied*, 123 S. Ct. 1284 (2003). The court made this observation in rejecting the "novel argument" that "state defendants expressly abrogated sovereign immunity" as to section 1983 claims by receiving federal funds under IDEA. *Id.*

The State Defendants, however, do note certain differences in language.[8] After enumerating several specific statutes, section 2000d-7 provides that a state shall not be immune from suit in federal court for a violation of "the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." This language, however, is merely included to indicate that, unlike section 1403, section 2000d-7 applies not only to a specifically listed statute but to any federal law forbidding discrimination by federal funding recipients. *But see Ohta v. Muraski*, No. 3:93 CV 00554, 1993 WL 366525, at \*4-\*5 (D. Conn. Aug. 19, 1993) (indicating that section 2000d-7 does not satisfy the requirements of clarity and specificity with regard to non-enumerated statutes). It is therefore not surprising that circuit courts considering whether section 2000d-7 constitutes a clear expression of congressional intent to condition the receipt of federal funds on a state's waiver of immunity from claims under the Rehabilitation Act, Title IX, or any other listed statute generally do not rely on or even discuss this additional clause. We did not even quote or paraphrase the words in *Koslow. Koslow*, 302 F.3d at 169, 170 nn..7-8.

It appears that the State Defendants' reliance on this expansive clause is actually based on a consideration of the overall scope of the underlying statutory schemes. They assert that, unlike section 2000d-7 and its related anti-discrimination statutes, neither section 1403 nor the overall IDEA restrict compliance with federal special education mandates and the waiver of constitutional immunity to states that actually accept federal IDEA funds. Section 1403 admittedly does not specifically refer to

---

8. Beyond these textual differences, the State Defendants attempt to distinguish the two statutory regimes on the grounds that the IDEA implicates the state's special interest in education and also mandates the adoption of a comprehensive statutory and administrative program. They emphasize that, while no state possesses a legitimate interest in discrimination, states do possess a valid interest in providing a free appropriate public education to their residents in a manner they see as appropriate given educational experience and research. Such assertions, however, have little if any relevance to our analysis of the language of section 1403.

recipients of federal financial assistance. The section, however, should not be construed in isolation from the overall statute. *See Bradley*, 189 F.3d at 753 (considering section 1403 and 1415). It expressly provides that a state loses its immunity from suit in federal court "for a violation of this chapter." There is clearly no violation of the IDEA if the IDEA itself is inapplicable. We therefore turn to the IDEA to consider whether its requirements apply to states not receiving federal financial assistance.

The IDEA was enacted pursuant to the congressional spending power. *See, e.g., Pace*, 325 F.3d at 614; *Kelly E.*, 207 F.3d at 935; *Mauney*, 183 F.3d at 831 n.11. A state is not generally bound by the IDEA unless it receives federal funding under the statute. The IDEA provides inter alia that "[a] State is eligible for assistance under this subchapter for a fiscal year if the State demonstrates to the satisfaction of the Secretary [of Education] that the State has in effect policies and procedures to ensure that it meets" several enumerated conditions. 20 U.S.C. § 1412(a). It further requires the establishment and maintenance of certain procedural safeguards by recipients of this aid.[9] *Id.* § 1415(a). Congress's funding is therefore available "on the condition that states implement policies assuring a 'free appropriate public education' for all their disabled children." *W.B. v. Matula*, 67 F.3d 484, 491 (3d Cir. 1995) (quoting previous version of 20 U.S.C. § 1412); *see also, e.g., Beth V.*, 87 F.3d at 81 (stating that IDEA "authorizes federal funding for states providing the special education that the statute requires, but funding is contingent on state compliance with its array of substantive and procedural requirements" (citation omitted)). Although also seen as an exercise of Congress's Fourteenth Amendment enforcement

---

9. The IDEA states that:

> Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies.

20 U.S.C. § 1415(a).

authority, *see, e.g., Dellmuth*, 491 U.S. 227 n.1; *Michael C. v. Radnor Township Sch. Dist.*, 202 F.3d 642, 652 n.9 (3d Cir. 2000); *Mauney*, 183 F.3d at 831 n.11, the requirements of the statute are still not enforceable unless the state actually accepts the funding offered by the federal government, *see, e.g.,* 34 C.F.R. § 300.2 ("This part applies to each State that receives payments under Part B of Act"); *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 784 (1st Cir. 1984) (stating that state "is free to accept or reject the participation of the federal government in its educational programs for the disabled"), *aff'd sub nom. Sch. Comm. of Town of Burlington, Mass. v. Mass. Dep't of Educ.*, 471 U.S. 359 (1985).

In the end, section 1403 functions in the same manner as section 2000d-7. Because the anti-discrimination mandate of section 504 does not apply unless the "program or activity" is actually "receiving Federal financial assistance," section 2000d-7's statement that a state shall not be immune "for a violation of section 504" only applies to recipients of federal funds. Likewise, because a state defendant cannot be held responsible for a "violation of this chapter" absent the receipt of federal money, section 1403's application is clearly limited to states that are the beneficiaries of federal financial assistance under the IDEA.[10]

There is also a difference in the headings of these two provisions. While section 2000d-7 is entitled "Civil rights remedies equalization," the IDEA provision bears the heading of "Abrogation of state sovereign immunity." Both the Seventh and the Eighth Circuits have expressed concerns about the language of section 1403, urging Congress to undertake "the appropriate legislative steps . . . to achieve the clarity necessary to ensure effective governance." *Marie O.*, 131 F.3d at 618; *see also Bradley*,

---

10. The State Defendants assert that New Jersey, even absent any continuing federal IDEA funding, would still be required to comply with its own statutory and regulatory scheme adopted because of the IDEA. This argument, however, raises matters of state law. New Jersey would have the power to alter or eliminate these various requirements without violating the IDEA, and any liability they have under New Jersey's current statutes and regulations would involve questions of state and not federal law in the absence of federal IDEA funding.

189 F.3d at 753; *Mauney*, 183 F.3d at 832. But both circuits have found that section 1403 constitutes an unambiguous waiver provision. *See, e.g., Kelly E.*, 207 F.3d at 935; *Bradley*, 189 F.3d at 753; *Mauney*, 183 F.3d at 831-32. The Fifth Circuit likewise found that, despite the title, "the text and structure of the statute make clear that the voluntary acceptance of federal IDEA funds will result in the loss of state sovereign immunity." *Pace*, 325 F.3d at 617 n.17 (citing *Bradley*, 189 F.3d at 753)). Section headings neither take the place of nor limit the plain meaning of the statute's text. *Id.* (quoting *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528-29 (1947)); *see also, e.g., Sandoval v. Reno*, 166 F.3d 225, 235 (3d Cir. 1999) ("[A] title alone is not controlling." (citation omitted)). Although we might expect a reference to both abrogation as well as waiver in the title, the absence of such additional "magic words" does not detract from the clarity of the provision as a clear statement of Congress's intent to condition participation in the IDEA program on the relinquishment of immunity.[11] *See MCI Telecomm.*

---

11. A.W. and the government refer briefly to the legislative history of section 1403. The State Defendants challenge such use of legislative history in this Eleventh Amendment context. Although such history does not provide a substitute for a clearly expressed statement of intent in statutory text, we did briefly consult it in considering section 2000d-7. *Koslow*, 302 F.3d at 170 n.9, 176 n.17.

Unlike in the enactment of section 2000d-7, we lack express indications of Congress's intent to make waiver of immunity a condition of federal funding under the statute. *Id.* The original Senate bill actually used the term "waiver." H.R. Conf. Rep. No. 101-787, at 55, reprinted in 1990 U.S.C.C.A.N. 1784, 1787. But the Senate eventually receded to the House version and its "abrogation" heading. *Id.* According to the Seventh Circuit, this development suggests that Congress consciously selected the abrogation title. *Marie O.*, 131 F.3d at 617-18. Senator Harkin also referred to his bill as an attempt "to reaffirm and clarify that the 11th Amendment is abrogated by the unequivocal text of the [IDEA]." 135 Cong. Rec. S9134 (daily ed. Jul. 31, 1989) (statement by Sen. Harkin).

The legislative history, although certainly not without ambiguity, still further supports our view of section 1403. Other items apparently indicate that Congress did not necessarily use the term "abrogation" in an exclusive fashion and may have also sought to provide for the waiver of immunity. The report of the House Education and Labor Committee

*Corp.*, 271 F.3d at 513 (noting that Telecommunications Act "does not include magic words such as 'waiver' or immunity' or 'suit'" but concluding that statute is sufficiently clear to establish that state commission's approval of interconnection agreements would be subject to federal court review).

Section 1403 therefore satisfies the Supreme Court's rigorous standard of clarity. The State Defendants point to the similarity between section 1403 and the provision purporting to abrogating immunity under the ADA. *See* 42 U.S.C. § 12202.[12] But we could make the same comparison between the ADA provision and section 2000d-7 itself. *See*

discussed this provision under the heading of "Waiver of State Sovereign Immunity." H.R.. Rep. No. 101-544, at 12 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1734. This report also clearly reflected a basic intent to ensure that state defendants are held liable for their violations of the statute. It stated that the *Dellmuth* ruling, holding that disabled children who are denied a free appropriate public education by the state are not entitled to tuition reimbursement, "misinterpreted Congressional intent." *Id.* Noting that such a "gap" was never intended, the report observed that it would be inequitable for the IDEA "to mandate State compliance with its provisions and yet deny litigants the right to enforce their rights in Federal courts when State or State agency actions are at issue." *Id.* Both the Fifth Circuit and the Seventh Circuit have cited this report as evidence that Congress intended to adopt a waiver provision. *Pace*, 325 F.3d at 617 n.12; *Marie O.*, 131 F.3d at 618 n.15. The Seventh Circuit also believed that Congress's failure in the 1997 reauthorization of the IDEA "to delete the term 'abrogation' in the wake of [the Supreme Court's abrogation ruling in *Seminole Tribe v. Florida*, 517 U.S. 44 (1996),] might well indicate that it views the statutory section as a waiver provision." *Marie O.*, 131 F.3d at 618.

12. 42 U.S.C. § 12202 states:

§ 12202. State immunity

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

*Pace*, 325 F.3d at 615 (stating that "§ 2000d-7 and 42 U.S.C. § 12202 of the ADA contain nearly identical language"). In the end, it is our comparison of the essentially identical terms of section 1403 and section 2000d-7 that is dispositive in these circumstances. Following our ruling in *Koslow*, we hold that section 1403 constitutes a clear statement of Congress's intent to condition the receipt of federal IDEA funds on a state's waiver of Eleventh Amendment immunity.[13]

It is undisputed that the NJDOE has received federal financial assistance under the IDEA. The State Defendants, however, assert that New Jersey has not *knowingly* waived its sovereign immunity by accepting this federal funding because it reasonably believed that the statutory provision had already successfully abrogated any such immunity from suit. This assertion is based on the understanding of a fully knowing waiver first developed by the Second Circuit in *Garcia*. The cases adopting this approach essentially hold that a state cannot waive its immunity with the requisite knowledge if it reasonably believed it had already lost its Eleventh Amendment rights and therefore apparently possessed no actual immunity to relinquish by taking federal funds.

In *Garcia*, a former medical student brought a number of claims, including a section 504 cause of action, against a New York state medical center and its personnel for allegedly discriminatory conduct beginning in September 1993 and ending in August 1995. *Garcia*, 280 F.3d at 103-05. The Second Circuit found that New York did not knowingly surrender its constitutional right to immunity because, at the time it accepted the federal funds, Title II of the ADA was reasonably understood as a valid abrogation of state immunity under the Commerce Clause. *Id.* at 114 & n.4 (citing *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 19-20 (1989) (plurality opinion)). Because it viewed Title II and section 504 as "virtually identical," the court held that "a state accepting conditioned federal funds could not have

---

13. We do recommend that the government include terms in the grant documents providing that states expressly agree to a waiver of Eleventh Amendment immunity as a condition for funding under the IDEA.

understood that in doing so it was actually abandoning its sovereign immunity from private damages suits, since by all reasonable appearances state sovereign immunity had already been lost." *Id.* at 114 (citations omitted). It emphasized that "even the most studied scholar of constitutional law" would have possessed little reason from September 1993 to August 1995 to doubt Congress's abrogation of immunity as to claims under Title II of the ADA. *Id.* at 114 n.4. The Second Circuit therefore found that New York retained its immunity from Rehabilitation Act claims. *Id.* at 114-15.

Judge O'Scannlain, joined by three other judges, adopted this view in a dissent from the Ninth Circuit's denial of rehearing en banc of the panel's holding that California waived its immunity from Rehabilitation Act claims by accepting federal funds. *Douglas v. Cal. Dep't of Youth Auth.*, 285 F.3d 1226, 1226-31 (9th Cir. 2002) (O'Scannlain, J., dissenting from denial of rehearing en banc). More significantly, the Fifth Circuit has firmly embraced this Second Circuit approach.

In *Pace*, a plaintiff brought claims under section 504 and the IDEA against certain state and other defendants. *Pace*, 325 F.3d at 612. After concluding that the IDEA does not validly abrogate Eleventh Amendment immunity, the court considered whether the state defendants knowingly waived their immunity from Rehabilitation Act and IDEA claims by accepting the relevant federal financial assistance during the 1996-97 and 1997-98 school years. *Id.* at 614-18. It determined that the state defendants "had little reason to doubt" the validity of Congress's asserted abrogation of sovereign immunity under section 504 or the nearly identical Title II of the ADA until the Fifth Circuit struck down the alleged abrogations in *Reickenbacker v. Foster*, 274 F.3d 974 (5th Cir. 2001). *Pace*, 325 F.3d at 616. Because they believed that the Rehabilitation Act and the ADA validly abrogated immunity, "the State defendants did not and could not know that they retained any sovereign immunity to waive by accepting conditioned federal funds." *Id.* The court noted that the state defendants did continue to accept such funds after the rulings in *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), and *City of Boerne v. Flores*,

521 U.S. 507 (1997), in which "the Supreme Court explained and then delineated Congress's power to abrogate state sovereign immunity only through § 5 of the Fourteenth Amendment." *Pace*, 325 F.3d at 616. The Fifth Circuit, however, refused to find that they thereby received notice of the continued existence of sovereign immunity before *Reickenbacker* and the 2001 holding in *Board of Trustees v. Garrett*, 521 U.S. 356 (2001), striking down Title I of the ADA as an invalid abrogation. *Pace*, 325 F.3d at 616 & n.10. It noted that the Fifth Circuit itself earlier held that the ADA successfully abrogated state sovereign immunity. *Id.* at 616 (citing *Coolbaugh v. Louisiana*, 136 F.3d 430 (5th Cir. 1998)). Even though the state defendants in *Pace* may have acted voluntarily, "they did not manifest a *knowing* waiver of that which they could not know they had the power to waive." *Id.*

The *Pace* court also held that the state defendants did not knowingly waive their immunity by accepting federal IDEA funds. *Id.* at 617-18. It noted that, before September 1998, no circuit court had ruled that section 1403 did not validly abrogate a state's constitutional immunity and that "this circuit did not hold so until today."[14] *Id.* at 617. Acting on the reasonable belief that the IDEA had already stripped them of any immunity, the state defendants "did not know that they retained any sovereign immunity to waive by accepting federal IDEA funds during the relevant time period." *Id.* at 617. Though not without objection, *Johnson v. La. Dep't of Educ.*, ___ F.3d ___, 2003 WL 21000830, at *3-*7 (5th Cir. 2003) (Weiner, J., dissenting or specially concurring), the Fifth Circuit has continued to apply this understanding of knowing waiver to Rehabilitation Act claims, *Miller v. Texas Tech Univ. Health Sciences Ctr.*, ___ F.3d ___, 2003 WL 21058546, at *1-*4 (5th Cir. 2003); *Johnson*, 2003 WL 21000830, at *2.

These cases generally rely on fundamental principles in arriving at their theory of waiver. Certain of these principles are well-established. For instance, we must draw all

---

14. In August 1999, the Eighth Circuit held that the IDEA did not constitute a valid abrogation of Eleventh Amendment immunity. *Bradley*, 189 F.3d at 750-52.

reasonable presumptions against waiver. *College Sav. Bank*, 527 U.S. at 682; *Miller*, 2003 WL 21058546, at *3; *Douglas*, 285 F.3d at 1228 (O'Scannlain, J., dissenting from denial of rehearing en banc); *Garcia*, 280 F.3d at 114. However, partly to overcome the weight of authority recognizing that acceptance of funds gives rise to a waiver of immunity under both section 2000d-7 and section 1403, the case law also emphasizes a general distinction, apparently made by the Supreme Court in *College Savings Bank*, between the state's actual abandonment of immunity and the clear expression of an intent by Congress to condition the acceptance of federal funds on such a relinquishment. *Pace*, 325 F.3d at 615-16; *Douglas*, 285 F.3d at 1227-28 (O'Scannlain, J., dissenting from denial of rehearing en banc); *Garcia*, 280 F.3d at 114, 115 n.5. The Supreme Court stated:

> There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suit brought by individuals. That is very far from concluding that *the State* made an "altogether voluntary" decision to waive its immunity.

*College Sav. Bank*, 527 U.S. at 681-82 (citation omitted).

We do not adopt the view of waiver advanced by *Garcia* and its successors. Although expressly based on a rather technical comparison of the ADA and the Rehabilitation Act, our specific rejection of *Garcia* in *Koslow* should at the very least caution us against adopting such an approach in the context of the IDEA and other federal statutes purporting to condition funding on a waiver of Eleventh Amendment immunity. *Koslow*, 302 F.3d at 172 n.12. Because we found that Pennsylvania waived sovereign immunity for Rehabilitation Act claims, *id.* at 167-72, any finding now that the State Defendants did not knowingly waive immunity from IDEA claims because they believed that section 1403 had stripped them of immunity from these claims raises unnecessary questions of consistency

and further uncertainty in the proper application of the Eleventh Amendment. *See Pace*, 325 F.3d at 617 & n.13 (citing *Koslow* as among the "contrary conclusions of other circuits on the question of waiver under § 504 of the Rehabilitation Act"). The rather novel approach offered by *Garcia* also appears to be contrary to both our examination of the Rehabilitation Act as well as the overwhelming weight of decisions finding that the acceptance of funds gives rise to a waiver under both section 2000d-7 and section 1403.

The consideration of broader principles does not alter our conclusion. The undisputed requirement to indulge all presumptions against waiver supports but does not mandate this approach. More importantly, the Supreme Court in *College Savings Bank* drew its distinction between the congressional statement of intent and the state's unequivocal expression of waiver in the context of rejecting *Parden*'s theory of waiver arising out of the state's conduct of otherwise lawful activity. *College Sav. Bank*, 527 U.S. at 675-87. Although acknowledging the general validity of this distinction, we note that it in no way addresses the kind of knowledge required for a truly knowing relinquishment of the constitutional right to immunity. On the contrary, the Supreme Court indicated that " 'a waiver may be found in a State's acceptance of a federal grant.' " *Id.* at 678 n.2; *see also id.* at 686-87, without stating that this acceptance does not give rise to a waiver when the state reasonably believes that any immunity has already been lost through abrogation.

The clear prerequisite of an "intentional relinquishment or abandonment of a known right or privilege" does not mandate our adoption of *Garcia* and its progeny. *MCI Telecomm. Corp.*, 271 F.3d at 504 (quoting *College Sav. Bank*, 527 U.S. at 681-82)); *see also Miller*, 2003 WL 21058546, at *3; *Pace*, 325 F.3d at 616; *Douglas*, 285 F.3d at 1228 (O'Scannlain, J., dissenting from denial of rehearing en banc); *Garcia*, 280 F.3d at 114. Even though the state may believe that it no longer possesses any sovereign immunity to surrender because of Congress's exercise of its constitutional power of abrogation, it still must be held to be aware that its surrender of this immunity constitutes a condition for federal financial

assistance due to the unambiguity of the statutory provision itself. Even the Fifth Circuit acknowledged that the primary purpose of the clear statement rule "is to ensure that states understand the bargain: Accept federal funds and thereby waive sovereign immunity." *Miller*, 2003 WL 21058546, at 2; *see also MCI Telecomm. Corp.*, 271 F.3d at 506 ("This requirement that Congress speak with a 'clear voice' ensures that the states exercise their choice knowingly and voluntarily, cognizant of the consequence (waiver of constitutional immunity) of participating in the permitted activity." (citation omitted)). By accepting such funds, the state knowingly gives up any possible right to immunity even if the abrogation is subsequently ruled invalid. *Cf. Johnson*, 2003 WL 21000830, at *7 (Weiner, J., dissenting or specially concurring) (stating that state defendants "made a conscious — 'knowing' — choice (1) to accept the federal funds *and*, (2) vis-a-vis *those funds*, to be subject to the Rehabilitation Act and to a lawsuit in federal court on Rehabilitation Act claims"). Particularly given the rapidly developing nature of Eleventh Amendment law, the state is actually surrendering something of particular value. It gives up "a significant measure of insurance against alterations in the law of sovereign immunity." *Bowers v. NCAA*, 171 F. Supp. 2d 389, 408 (D.N.J. 2001); *see also Doe v. Nebraska*, No. 4:CV95-3381, 2002 WL 225907, at *8 n.8 (D. Neb. Feb. 14, 2002) (quoting *Bowers*, 171 F. Supp. 2d at 408)).

Finally, practical considerations indicate the inappropriateness of the *Garcia* approach. The Second Circuit recognized "that an argument could be made that if there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity." *Garcia*, 280 F.3d at 114 n.4. Under such circumstances, a state deciding whether to accept funds would no longer be ignorant "of the fact that it was waiving its possible claim to sovereign immunity." *Id.* The Fifth Circuit therefore has indicated that this approach only "applies to a limited number of historical cases as a result of fast-developing sovereign immunity jurisprudence at the Supreme Court and this court," resulting in temporary and

largely Pyrrhic victories for state defendants. *Miller*, 2003 WL 21058546, at \*4 n.9; *see also Johnson*, 2003 WL 210000830, at \*2; *Pace*, 325 F.3d at 618 n.15. However, both the case law as well as the State Defendants themselves point to different cases as crucial in the determination of when, if ever, they should be held to know that any abrogation was invalid.[15] *See, e.g., Miller*, 2003 WL 21058546, at \*4 nn.8-9 (indicating that decision itself provides notice but refusing to decide whether *Garrett* or Fifth Circuit's decision in *Reickenbacker* do so as well); *Johnson*, 2003 WL 210000830, at \*2 (focusing on *Garrett* but also mentioning *Reickenbacker*); *Pace*, 325 F.3d at 615, 618 n.15 (focusing on *Garrett* but also referring to circuit court rulings); *Douglas*, 285 F.3d at 1229-31 (O'Scannlain, J., dissenting from denial of rehearing en banc) (emphasizing *Garrett*) *Garcia*, 280 F.3d at 114 n.4 (focusing on *Seminole Tribe* and *City of Boerne*). We should not allow the application of the Eleventh Amendment, implicating both the state's constitutional entitlement to immunity and the private litigant's right to have his or her federal rights vindicated in a federal forum, to be subject to such unnecessary uncertainty and lack of precision.

It therefore appears that the acceptance of federal funds under the IDEA results in the waiver of any immunity from A.W.'s IDEA claims against the State Defendants. This waiver, as a condition of federal funding, must still satisfy the general restrictions placed on the exercise of the spending power. The State Defendants argue that the waiver of immunity is not related to the purposes of the IDEA and that section 1403 is unduly coercive because New Jersey may lose all of its federal IDEA funding by failing to accept the surrender of immunity. Both assertions are without merit.

There is clearly a "discernible relationship" between waiver and federal interests in the IDEA program.

---

15. The State Defendants argue that they are entitled to actual notice from the federal government stating that New Jersey has a right to immunity. They cite no case law imposing such a mandate and *Garcia* and its successors provide no support for it. We likewise must reject their last-minute laches argument.

According to the statute itself, the IDEA has several objectives, including "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A), (B). The State Defendants, emphasizing that the IDEA's stated purpose is not the prevention of discrimination and noting the special state concerns with education, assert that there is no connection between Eleventh Amendment immunity and the education of children with disabilities. We find that the requirement of waiver clearly promotes these interests in a free appropriate public education for all disabled children and the protection of the rights of children and parents by ensuring full accountability in federal court for statutory violations committed by state educational authorities who receive federal financial assistance under the IDEA.[16] *Cf., e.g., Koslow*, 302 F.3d at 175-76 (finding that waiver of

---

16. In *Koslow*, we expressly held that a state's waiver of immunity as to Rehabilitation Act claims is limited to the department or agency actually receiving federal funds. *Koslow*, 302 F.3d at 168-72. The State Defendants assert that section 1403 fails the relatedness requirement because the waiver of immunity is not limited in this fashion. Although A.W. admits that any waiver is restricted to the department or agency actually receiving federal financial assistance under the IDEA, it is unclear whether this approach actually applies to any waiver under the IDEA. A district court held based on *Koslow* that only state departments actually receiving federal IDEA funds surrender their Eleventh Amendment immunity. *S.C. ex rel. C.C. v. Deptford Township Bd. of Educ.*, 248 F. Supp. 2d 368, 385 (D.N.J. 2003). The court therefore dismissed the New Jersey Division of Developmental Disabilities from the IDEA action because of the absence of any evidence that this agency received such funds. *Id.* at 385-86. But our discussion of the scope of a Rehabilitation Act waiver was specifically guided by the statutory definition of "program or activity." *Koslow*, 302 F.3d at 168-72. The parties have failed to point to any similar language in the IDEA.

We, however, need not resolve this issue because A.W. does not name as a defendant either New Jersey or any state department that does not benefit from federal funding under the IDEA.

immunity from section 504 claims advances federal interest in eliminating disability discrimination from federally funded departments or agencies); *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 522 (E.D. Pa. 2001) ("Through section 2000d-7(a)(1), Congress linked the federal government's legitimate interest in eliminating discrimination against disabled individuals in the programs its endows to State accountability for such discrimination.").

The issue of unconstitutional coercion has the potential to raise fundamental questions regarding the appropriate relationship between the federal and state governments. The circumstances of this case, however, do not require us to explore these broader aspects. We have already rejected a coercion challenge to section 2000d-7. *Koslow*, 302 F.3d at 172 n.11, 173-74. The State Defendants actually fail to furnish any information as to the amount of funds received by New Jersey under the IDEA and the proportion of such funding in relation to the state's overall educational spending. *See, e.g., Jim C. v. United States*, 235 F.3d 1079, 1082 (8th Cir. 2000) (en banc) (noting that Arkansas's sacrifice of 12 percent of education budget "would be politically painful" but not compulsive), *cert. denied*, 533 U.S. 949 (2001). Under these circumstances, the state's powers as a political sovereign, especially its authority to tax, appear more than capable of preventing undue coercion through "economic 'encouragement.' " *Koslow*, 302 F.3d at 174. We do not deny the considerable pressures placed on states to accept federal special education funds, but we cannot conclude that the IDEA, recognized as "a model of 'cooperative federalism'," *Beth V.*, 87 F.3d at 82 (citations omitted), gives rise to unconstitutional compulsion.[17]

---

17. The State Defendants further argue that the IDEA, particularly section 1403, fails to provide states with sufficient notice of prohibited conduct. They assert that the statute is void on grounds of vagueness and that its mandates are not stated with the requisite unambiguity to allow a state to make a knowing choice of whether to accept its requirements in exchange for federal money. Such very broad assertions should be rejected given the lack of any citation to a case finding the IDEA's requirements insufficiently clear as well as the long-established principle that the IDEA "confers on disabled children a substantive right to a 'free appropriate public education'." *Beth V.*, 87 F.3d at 81 (quoting 20 U.S.C. § 1400(c)).

## IV.

The District Court, applying the waiver exception, correctly found that the State Defendants are not entitled to immunity under the Eleventh Amendment from A.W.'s Rehabilitation Act and IDEA causes of action. Its denial of the State Defendants' motion to dismiss therefore will be affirmed.

For the foregoing reasons, the order of the District Court entered on March 19, 2002, will be affirmed.

A True Copy:
　　　Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*